**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | 21CR418 |
| Ibrahim Al Amreeki , | Judge Gettleman |
| Defendant. | |

**DEFENDANT'S SENTENCING MEMORANDUM AND OBJECTIONS TO THE
PRESENTENCE REPORT**

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ........................................................................................ i

**TABLE OF AUTHORITIES** ............................................................................... iii

**DEFENDANT'S SENTENCING MEMORANDUM AND OBJECTIONS TO THE
PRESENTENCE REPORT** ................................................................................... 1

I.    **OVERVIEW OF SENTENCING REQUEST** ............................................. 1

II.    **THE NATURE AND CIRCUMSTANCES OF THE OFFENSE** ................ 1

III.    **IN CONSIDERING THE § 3553(a) FACTORS, IBRAHIM'S PERSONAL
HISTORY AND CHARACTERISTICS, A 13 MONTH SENTENCE IS
SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO MEET THE
PURPOSES OF PUNISHMENT** ....................................................................... 3

    A.  *Ibrahim was largely raised by a single mother who kicked him out for using
marijuana when he was 17 years old to live with his methamphetamine-addicted
father; instead, he took to the streets* ................................................. 3

    B.  *Ibrahim was rendered homeless and alone at 17 years old* ................... 5

    C.  *Ibrahim has an extensive mental health history and has struggled with substance
abuse for much of his life* ..................................................................... 6

IV.    **A SENTENCE OF 13 MONTHS WOULD PROVIDE THE DEFENDANT WITH
NEEDED EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE,
OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE
MANNER AND ACCOUNTS FOR THE KINDS OF SENTENCES AVAILABLE**
............................................................................................................................ 11

V.    **OBJECTIONS AND CORRECTIONS TO THE PRESENTENCE REPORT** ....... 12

    A.  *Defendant objects to 6 point enhancement under § 2A6.1(b)(1)* ......... 12

        1.  **The June 11, 2021 allegations do not show conduct evidencing an
intent to carry out such threat** ............................................ 13

        2.  **Ibrahim's criminal history does not show conduct evidencing an
intent to carry out such threat** ............................................ 14

    B.  *Defendant objects to "double counting" of criminal history points* ................. 15

C.  *Defendant objects to two criminal history points for being on probation at the time of the offense* ............................................................................................ 15

D.  *Defendant objects to Discretionary Condition 14* ............................................... 17

**VI.   CONCLUSION** ................................................................................................. 17

## TABLE OF AUTHORITIES

**CASES**

*United States v. Booker*, 543 U.S. 220 (2005) ............................................................. 1

*Gall v. United States,* 552 U.S. 38 (2007) ............................................................. 1, 16

*United States v. Sullivan,* 75 F.3d 297 (7th Cir. 1996) ......................................... 12-13

*United States v. Thomas*, 155 F.3d 833, 838 (7th Cir. 1998) ...................................... 15

**STATUTES**

18 U.S.C § 3553(a) ............................................................................................. 1, 3, 16

18 U.S.C. § 875(c) ....................................................................................................... 1

U.S.S.G. § 2A6.1 .................................................................................................. 12-13

**OTHER AUTHORITIES**

*Asperger's Syndrome*, WebMD (last visited June 24, 2022)
https://www.webmd.com/brain/autism/mental-health-aspergers-syndrome ................................. 7

*Luvox Tablet - Uses, Side Effects, and More,* WebMD (last visited June 6, 2022)
https://www.webmd.com/drugs/2/drug-1089/luvox-oral/details ................................... 8

*Zyprexa - Uses, Side Effects, and More*, WebMD (last visited June 6, 2022)
https://www.webmd.com/drugs/2/drug-1699/zyprexa-oral/details................................. 8

**DEFENDANT'S SENTENCING MEMORANDUM AND OBJECTIONS TO THE PRESENTENCE REPORT**

Defendant Ibrahim Al-Amreeki, by his attorney, Dena M. Singer of Bedi & Singer, LLP, respectfully requests, under 18 U.S.C § 3553(a) and *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, that this Court impose a sentence of 13 months followed by a term of supervised release. In support of this request, Ibrahim states as follows:

## I.  OVERVIEW OF SENTENCING REQUEST

Ibrahim respectfully requests pursuant to 18 U.S.C. § 3553(a) and *Gall v. United States*, 552 U.S. 38 (2007) that this court impose a sentence of 13 months. The proposed sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing. The proposed sentence reflects the seriousness of the offense while taking into account his personal history and characteristics.

## II.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Ibrahim pled guilty to making a threatening communication transmitted in interstate commerce in violation of 18 U.S.C. § 875(c). The threat, to which he pleaded stated, "My plan is to kill my wife." The Court needs to consider the nature and circumstances of the incident and the timeline of events. When doing so, this court will conclude that a sentence of 13 months is appropriate.

On May 14, 2021, Ibrahim was "friended" on Facebook by an individual he began messaging. Unbeknownst to Ibrahim, this individual was a FBI Online Covert Employee ("OCE"). This individual continued to converse with Ibrahim. At the time, Ibrahim lived in a tent in an encampment in Eugene, Oregon. On June 11, 2021, at 7:50 a.m., police were dispatched to the area of tents where Ibrahim was staying. On scene, a woman named Allison Cortez told officers that Ibrahim threatened her and Wilma Michael, Ibrahim's common law wife, with an

1

axe. When officers arrived, Ibrahim was not on the scene, officers did not see any of this incident. The Eugene Police Report from that morning does not indicate they interviewed Wilma at this time. The axe which Ibrahim supposedly used was on the scene, and officers took it into their custody.

At approximately 12:58 p.m. that same day, officers were called to the tent encampment again by Allison Cortez. When officers began to speak with Cortez, they noted she was making "nonsensical statements" and "said something to the effect that Brandon (Knight)[1] swiped at her tent with a knife but did not damage it." Only then did officers speak to Wilma alone. During this conversation, she "essentially stated that Knight came at them with an axe earlier," but police reports do not indicate she stated anything about Ibrahim swiping at a tent with a knife. Officers then interviewed an individual named Corene Rich, who stated Knight hit the tent with a knife and described it as a three-inch blade. Yet Rich also stated, "he did not slice or puncture the tent, and Cortez did not open the tent." The officer concluded "there was no crime of menacing or unlawful use of weapon due to there being no damage to the tent or visual contact between the parties." Again, Ibrahim was not at the tent encampment when the officers were there. Later that afternoon, Ibrahim began speaking with the FBI OCE over facebook. This is when Ibrahim stated, "my plan is to kill my wife" to the FBI OCE.

Later that same day, officers "received information that Knight was wanted by the FBI and they were pinging his phone." From this FBI trace, Eugene Police Officers were able to locate Ibrahim in a tent previously pointed out to them as one Ibrahim owned. He was arrested and taken into custody of the Lane County Jail. His property was inventoried and did not include any weapons. He was released from the Lane County Jail 5 days later on June 16, 2021, and no

---

[1] Ibrahim's birth name was Brandon Michael Knight. (PSR, ¶68). He changed his name to Ibrahim Al-Amreeki on or about August 10, 2020. (PSR, ¶68).

charges were filed against him. Had there been any determination that Wilma was in real danger or harm, Ibrahim would not have been released. On June 17, 2021, Ibrahim again communicated with the FBI informant, and made statements which formed the basis of count two of the superseding indictment. On July 6, 2021, Ibrahim was arrested by the FBI and taken into federal custody on these charges.

As discussed in further detail below,[2] the nature and circumstances do not show that a lengthy sentence is appropriate. These circumstances reflect an individual who struggles with mental health and substance abuse problems whose Asperger's diagnosis affects how he interacts with the world. How his ramblings on the internet are just that and while they could be interpreted by others to be a threat his actions do not comport with the enhancement the government seeks. Ibrahim's underlying mental health conditions contribute to his statements. The nature and circumstances reflect an individual who needs assistance controlling the issues he is facing, not someone who has intent to carry out a serious threat.

### III. IN CONSIDERING THE § 3553(a) FACTORS, IBRAHIM'S PERSONAL HISTORY AND CHARACTERISTICS, A 13-MONTH SENTENCE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO MEET THE PURPOSES OF PUNISHMENT

Ibrahim's childhood wherein he was rendered homeless at 17, his mental health history, and his background are all reasons why 13 months is the appropriate sentence.

A. *Ibrahim was largely raised by a single mother who kicked him out for using marijuana when he was 17 years old to live with his methamphetamine-addicted father; instead, he took to the streets*

Ibrahim was born on November 20, 1994, in Baltimore, Maryland, to Donald Knight and Laura Holbrook. (PSR, ¶68). Ibrahim has three older brothers: Donny Knight, David Knight, and Steven Knight. (PSR, ¶70). Ibrahim and his family lived in Maryland until about 2006, when

---

[2] See Section V(A), *infra*

they relocated to Arizona. (PSR, ¶75). At some point before the move, Ibrahim was sexually abused by one of his older brothers. (Ex. 1). Ibrahim has a memory of this occurring but he cannot recall exactly what happened or how old he was. (Ex. 1). The best he can say is he was "[at] five, six, or seven [years old]." (Ex. 1). Beyond that, it is difficult for him to discuss exactly what occurred or how many times he was sexually abused. In 2007, his parents divorced and Ibrahim was largely raised by his mother until he was about 17 years old. (PSR, ¶69).

Ibrahim had an IEP all throughout his schooling and had early intervention speech therapy, occupational therapy, and physical therapy before he was enrolled in school. (Ex. 2). Ibrahim attended both grade school and high school in Tucson, Arizona. (PSR, ¶100). Ibrahim attended Rollin T. Greeley Middle School. (PSR, ¶100). He then attended 9th through 11th grade at Sahuaro High School from approximately 2010 to 2012. (PSR, ¶101). While at Sahuaro, he participated in the Exception Education Program with modified classes. (PSR, ¶101; Ex. 2). Ibrahim was expelled from Sahuaro due to excessive absenteeism. (PSR, ¶101). Ibrahim stopped attending school due to poor self-esteem. (PSR, ¶101). Ibrahim believed he "smelled bad" because of homelessness and "poor hygiene." (PSR, ¶101). Ibrahim completed the first semester of the eleventh grade before he transferred to an unspecified school. (PSR, ¶101). Ibrahim then dropped out of high school in the eleventh grade. Ibrahim earned his General Education Development (GED) while in custody in Anchorage, Alaska in October 2016. (PSR, ¶102).

The poor hygiene and homelessness which prevented Ibrahim from going to school resulted from his mother throwing him out of the house. (PSR, ¶72). In May 2012, when Ibrahim was 17 years old, his mother kicked him out of the house because he was using marijuana. (PSR, ¶72). She told him he had to go live with his father. (PSR, ¶72). However, his father was using methamphetamine and was generally "a mess." (Ex. 1). So, Ibrahim took to the streets and never

4

returned home. (PSR, ¶72). Ibrahim has not seen his father in years.

Once Ibrahim left his mother's house, he remained in Arizona for about another year. (PSR, ¶75). Then, he left Arizona and began traveling throughout the United States. (PSR, ¶75). Ibrahim has had no permanent place of residence for approximately ten years prior to his arrest and detainment in this case. (PSR, ¶75). Ibrahim describes himself as having "itchy feet" and will travel anywhere from a few miles to thousands and thousands of miles. (Ex. 1). Ibrahim travels by train and hitchhikes across the country, though he has usually stayed in California, Alaska, or Oregon. (PSR, ¶75). He describes himself as a "nomadic and migratory person" who lived in tents under freeway overpasses, mainly in the Eugene, Oregon, area. (PSR, ¶75). He has spent most of his adult life "train hopping" and living in encampments. (Ex. 1). Despite not having a permanent home and often living in a tent, Ibrahim does not consider himself "homeless." (Ex. 1).

Ibrahim's difficult childhood, being sexually abused by one of his brothers, and lack of family support are all reasons why 13 months is the appropriate sentence.

B. *Ibrahim was rendered homeless and alone at 17 years old*

As discussed above, Ibrahim was rendered homeless at 17 years old when his mother threw him out of the house for continuing to use marijuana. (PSR, ¶72). When Ibrahim was forced out of his childhood home, he was left to fend for himself in the streets. He had nowhere to go, no one to care for him, and no assistance. The cumulative impact of being homeless and alone at 17 years old should not be minimized. When Ibrahim first found himself on his own, he had to find a place to stay. For Ibrahim, it was a tunnel next to the school. (Ex. 1). Ibrahim believed he was "safe" there, and because he was adjacent to the school, he could continue to attend classes. (Ex. 1). His situation became exhausting. Ibrahim was living in a tunnel without

proper food, a bathroom, a shower, a bed or mattress, and without appropriate heat or ventilation.

Understandably, Ibrahim quickly grew weary of his situation. He did not want to attend high school; he felt self-conscious because of his living situation, his inability to shower, and his lack of clean clothes. Ibrahim found a more welcoming scenario at the nearby university, which was attached to the mosque. At the university, he was able to rest, read, and study unimpeded. (Ex. 1). At the mosque, he was also able to eat and pray. (Ex. 1). Ibrahim could not go home and had no money, so he was unable to buy food. But, at the mosque, the members would feed him. (Ex. 1). Ibrahim would skip school to attend university. It was during this period that Ibrahim taught himself Arabic. (Ex. 1). He gradually began spending more and more time at the mosque and the university. (Ex. 1). He describes the people at the mosque as "good people" who were encouraging him to become a scholar. (Ex. 1). Ibrahim became a Muslim and the mosque is where he was welcomed, found a home, and felt loved and appreciated. (Ex. 1).

Ibrahim's homelessness and the issues that resulted from being homeless at 17 are all factors this Court should consider when crafting a sentence.

C. *Ibrahim has an extensive mental health history and has struggled with substance abuse for much of his life*

Ibrahim has an extensive mental health history both as an inpatient and an outpatient. He has also battled drug and alcohol abuse. Ibrahim reported to probation he participated in mental health intake assessments as a minor and as an adult, but he could not recall the dates of these assessments. (PSR, ¶83). He also stated that he was diagnosed with Asperger's Syndrome, an unspecified personality disorder, and bipolar disorder (year(s) not specified). (PSR, ¶82). Ibrahim's mother concurs that Ibrahim has Asperger's Syndrome and had "developmental delays and struggles in childhood." (Ex. 3). He was diagnosed with Asperger's around 10 or 11 years

old by a psychologist. (Ex. 2).[3]

As an adult, Ibrahim still struggles with mental health issues. On March 23, 2013, at 18 years old, Ibrahim was admitted via emergency room presentation to Sonora Behavioral Hospital in Tucson, Arizona, stating, "My thoughts are out of control." (Ex. 4). Medical records indicate "The patient has had psychiatric problems most of his life. He was once diagnosed as having Asperger's syndrome." (Ex. 4). According to his mother he had no mental health treatment since being diagnosed with Aspergers as a child. (Ex. 2). At the time of his admission, Ibrahim had been using spice and cannabis and these substances had put him in a "downward spiral." (Ex. 4). He reported that his thoughts "overwhelm him" and that it is "difficult for him to think clearly." (Ex. 4). Ibrahim also reported "suicidal thoughts" but "denied any plan or intention" to hurt himself or other people. The records further indicate that Ibrahim's "conversation is quite paranoid." (Ex. 4). Ibrahim admitted "worry" about his future and seemed "slightly confused" upon admission. (Ex. 4). His affect was "bland" and his style of speech was "concrete and rather stilted." (Ex. 4).

During his social history interview, Ibrahim reported "economic distress" and "financial difficulties." (Ex. 4). Ibrahim also reported sexual abuse from a brother when he was younger. (Ex. 4). In addition, during his mental status examination, Ibrahim was "disheveled upon approach." (Ex. 4). His recall was "correct for only one out of three items after a five-minute delay." (Ex 4). His intellectual functioning was "below average;" his concentration/attention was "poor;" his psychomotor was "retarded and slow;" his thought process was "paranoid and loose;" his affect was "blunt;" his mood was "depressed and anxious;" his speech was "stilted;" he had

---

[3] Asperger's syndrome is part of a broader category called autism spectrum disorder. A person with Asperger's Syndrome has "more trouble with social skills. They also tend to have an obsessive focus on one topic or perform the same behaviors again and again." *Asperger's Syndrome*, WebMD (last visited June 24, 2022) https://www.webmd.com/brain/autism/mental-health-aspergers-syndrome

"paranoid delusions," "poor insight," and "poor judgment." (Ex. 4). He also reported "vague suicidal thoughts." (Ex. 4). Upon admission, Ibrahim was treated with a combination of Luvox[4] and Zyprexa.[5]  Psychiatric inpatient services were deemed "medically necessary for treatment." (Ex. 4). Based on the doctor's evaluations at the time of discharge, Ibrahim had made "significant improvement" while hospitalized. (Ex. 4). He was released on March 29, 2013, with a recommendation to see a psychiatrist within a week to 14 days and to consider an intensive outpatient program for mental health at Sonora Behavioral Health. (Ex. 4). This was his first Sonora Behavioral Health Hospital admission. (Ex. 4).

The following year, Ibrahim received additional mental health treatment from a different facility the following year. According to records from Southcentral Foundation in Anchorage, Alaska, Ibrahim engaged in behavioral health services in December 2014 and for several months in 2017. (PSR, ¶86). No details of Ibrahim's participation in 2014 were reported. (PSR, ¶86). However, on January 25, 2017, during an intake assessment, Ibrahim reported having one episode of suicidal ideation in March 2016 when he verbally threatened to kill himself because his girlfriend was cheating on him. (PSR, ¶86). His girlfriend called the police, and he was admitted to the Alaska Psychiatric Institute for ten days. (PSR, ¶86). When Ibrahim was discharged from one of his inpatient stays on September 14, 2017, Ibrahim indicated he was "pleased with his ability to handle daily life and getting along better with others. [Ibrahim]

---

[4] Luvox (fluvoxamine) is used to treat obsessive-compulsive disorder (OCD). It "helps to decrease thoughts that are unwanted or that don't go away (obsessions) and it helps to reduce the urge to perform repeated tasks (compulsions such as hand-washing, counting, checking) that interfere with daily living. Fluvoxamine is known as a selective serotonin reuptake inhibitor (SSRI). This medication works by helping restore the balance of a certain natural substance (serotonin) in the brain." *Luvox Tablet - Uses, Side Effects, and More,* WebMD (last visited June 6, 2022) https://www.webmd.com/drugs/2/drug-1089/luvox-oral/details
[5] Zyprexa (olanzapine) is used to treat certain mental/mood conditions (such as schizophrenia, bipolar disorder). It may also be used in combination with other medications to treat depression. "This medication can help to decrease hallucinations and help you to think more clearly and positively about yourself, feel less agitated, and take a more active part in everyday life. Olanzapine belongs to a class of drugs called atypical antipsychotics. It works by helping to restore the balance of certain natural substances in the brain." *Zyprexa - Uses, Side Effects, and More*, WebMD (last visited June 6, 2022) https://www.webmd.com/drugs/2/drug-1699/zyprexa-oral/details

expressed delight at being able to better cope when things were wrong, and an improved quality of life." (PSR, ¶86). Ibrahim indicated that he is not taking any medication for mental health issues because they "make you a "zombie" and are not effective in treating mental health problems. (PSR, ¶87; Ex. 1).

It should also be noted that the program at Southcentral Foundation also had a substance abuse program. (PSR, ¶94). Ibrahim was present for the assessment based on a court directive, although Ibrahim did not believe he had a problem with drugs or alcohol. (PSR, ¶94). However, Ibrahim was diagnosed with alcohol dependence, cannabis abuse, and nicotine dependence. (PSR, ¶94). He participated in a Level I outpatient program. (PSR, ¶94). Ibrahim participated in individual and group therapy sessions from March 7, 2017, to September 14, 2017. (PSR, ¶94). During that period, Ibrahim participated in the following treatment services/groups: relapse prevention; family education, healthy relationships; dialectical behavior therapy; health education; and social support. (PSR, ¶94). Ibrahim had "good group interaction but with continued storytelling and glorifying previous behavior." (PSR, ¶94).[6]

Ibrahim understands that he must confront the mental health issues that have plagued him since childhood. While Ibrahim has had intermittent treatment throughout the years, the treatment has been inconsistent and insufficient. From time to time, Ibrahim has used street drugs to help him cope with his mental issues, and he knows this is neither a long-term nor an appropriate solution. To succeed once he is released, Ibrahim needs a plan to allow him to cope with and learn the most productive way to deal with his mental health challenges. Thus he is amenable to mental health treatment and drug treatment. Ibrahim recognizes that for him, "alcohol is bad." (Ex. 1).

---

[6] Ibrahim also identified the Coordinated Research Project (CRP) in Anchorage, Alaska as an additional facility where he received mental health treatment. (PSR, ¶85). He was unsure of the dates.

Ibrahim's brother, David, is familiar with his brother's mental health challenges and would like this Court to know, "Brandon is a very intelligent young man although misguided secondary to his mental health diagnosis of Asperger's Syndrome. This has benefited him in many ways but also presents him with social challenges and has contributed to substance abuse. Although this should not be an excuse for criminal action committed, I believe that this plays a major role in his decision-making." (Ex. 5). Ibrahim's stepfather, who has been in Ibrahim's life for 14 years, reflects these thoughts regarding Ibrahim's challenges, "[o]ver this time, I have become quite familiar with his behaviors and his demeanor. Brandon has a truly good heart and has never done anything to harm anyone or himself as far as I am aware, but unfortunately, due to his Asperger's diagnosis, his words and social awkwardness get him in trouble in today's society. He has been known to be quite impulsive in the things he says, often saying things without giving them much thought. But on the other hand, when he takes the time to process his thoughts, amazing conversations can be had with this bright young man." (Ex. 6).

Ibrahim understands that he needs treatment for his mental health and substance abuse issues. Ibrahim has become deeply aware of the ramifications that arise from the combination of alcohol and street drugs, particularly in light of his mental health struggles. According to Bureau of Prisons records, as of May 12, 2022, Ibrahim has been on a waitlist to participate in a non-residential drug treatment program while being detained on the instant case. (PSR, ¶97). Ibrahim knows that if he is to succeed upon his release, he needs to learn to cope without these substances. Ibrahim has benefitted from substance abuse and mental health counseling in the past and believes that consistent treatment would improve his day-to-day life. Ibrahim's brother, Donny, agrees. Donny says, "[Ibrahim] has his family's support and we are all here for him to get the help he needs and guidance. I know what addiction can do to a  person. I am a recovering

addict myself and I decided to change my life and be a contributing member of society and I

work in a drug and alcohol treatment center and have many resources and am ready to help my

brother as soon as this is all settled." (Ex. 7).

Thus, Ibrahim's ever-present and pervasive mental health and substance issues should be

considered by this Court when crafting a sentence.

## IV. A SENTENCE OF 13 MONTHS WOULD PROVIDE THE DEFENDANT WITH NEEDED EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER AND ACCOUNTS FOR THE KINDS OF SENTENCES AVAILABLE

When sentencing an individual, the court must consider the need to provide the defendant

with needed educational or vocational training, medical care, or other correctional treatment in

the most effective manner. 18 U.S.C. § 3353(a)(2)(D).

At 28 years old, Ibrahim realizes that he needs mental health counseling and substance

abuse treatment to cope with everyday challenges. He is painfully aware that mental health

issues and alcohol abuse are the root causes of many of his issues. Ibrahim needs uninterrupted

and consistent care that will ensure that he will thrive and succeed day-to-day. The only way this

can be truly accomplished is if Ibrahim were to receive treatment outside of custody as part of a

probationary type sentence. If Ibrahim were to be incarcerated, his treatment would naturally be

interrupted upon his release, and he would find himself having to start over with new doctors and

new therapists. Ibrahim has never had the advantage of consistent care. The sporadic care that he

has received has worked wonders for the brief time that he has received therapy. Both Ibrahim

and society would benefit if Ibrahim were to receive the help he requires. This, too, will also

provide deterrence. It is Ibrahim's hope that, with the Court's permission, he will return to

Eugene, Oregon to serve his probationary term and receive the mental health and addiction

treatment he requires. The Court should find a sentence of 13 months adequately accounts for the

above factors.

## V.     OBJECTIONS AND CORRECTIONS TO THE PRESENTENCE REPORT

Ibrahim pled guilty to the conduct for which he is guilty, transmitting a threat. The government wants this Court to also punish him based on conduct he did not plead guilty to, conduct which has no federal nexus and some of which conduct is already charged in state court.

### A.   Defendant objects to 6 point enhancement under § 2A6.1(b)(1)

This court should not apply the enhancement under § 2A6.1(b)(1). Both the government and probation opine that the base offense level should be increased by six points under 2A6.1(b)(1) as "the offense involved any conduct evidencing an intent to carry out such threat." U.S.S.G. 2A6.1(b)(1).

The Government points to *United States v. Sullivan*, in arguing that the 6 point enhancement applies because "courts have looked not only to the "overt activity" surrounding the threat but even to the nature of threats themselves." *Sullivan*, 75 F.3d 297 (7th Cir. 1996) However, *Sullivan* also states, "the critical issue should not be the timing of the conduct, but whether the conduct shows the defendant's intent and likelihood to carry out the threats." *Id.* at 301 (internal citations omitted). In addition, "it is the responsibility of the district court to distinguish mere talk from talk which evidences an intent to act. The proper inquiry for the district court is thus whether any threat, charged or uncharged, was made in a manner or under circumstances which suggest an intent to carry out the threats which form the basis of the conviction." *Id.* at 302. In this case, the threats and allegations the government is relying on to argue for this enhancement should be scrutinized carefully by this court. Both the facts accompanying the underlying threats and Ibrahim's criminal history do not show there is evidence to carry out the threat that was made.

Further, the plain language of Section 2A6.1 shows this enhancement should not apply, as

Section 2A6.1 is "intended to punish more severely those threats which, but for the intervention of law enforcement, would likely have been carried out." *Sullivan,* 75 F.3d at 302.

### 1. The June 11, 2021 allegations do not show conduct evidencing an intent to carry out such threat

The government and probation refer to alleged incidents with unreliable witnesses, and no allegations of physical conduct to argue this enhancement applies. The June 11, 2021 incident referenced in the PSR and the government's version contains allegations that Ibrahim swung a hatchet around and later returned and swiped at a tent with a knife. When officers first arrived on the scene, Ibrahim was not there. One of the witnesses and individual who stated she was threatened by Ibrahim was Allison Cortez. Officers seized the hatchet on the scene from Cortez herself, but never saw Ibrahim with this weapon at all. Later, when officers were called back to the scene, it was due to a call from Allison Cortez. When officers arrived on scene, they stated, "Cortez was very animated and speaking extremely rapid. She made several nonsensical statements to include that her tent had surveillance camera which police had access to and she was an active Marine." Additionally police stated "[s]everal times through the contact Cortez referred to Michael as her, 'Daughter,' although when I first contacted Cortez, she did not know Michael's name." Another witness to these alleged incidents, Wilma Michael, was present for all of the statements by Cortez and made similar statements to what Cortez had already told police. An additional witness, Corene Rich,[7] while stating Ibrahim swiped at the tent with a knife, stated that there was no rip or puncture to the tent nor was the tent opened by Cortez. She mentions nothing about the hatchet incident from that morning. The officer concluded regarding the tent swipe incident "I determined there was no crime of menacing or unlawful use of a weapon due to there being no damage to the tent or visual contact between the parties." Additionally, testing

---

[7] In a later interview with the FBI, Rich states that she was being threatened by Cortez over text messages and stated that Cortez was "crazy."

was done by the FBI on the recovered hatchet. No blood was found on the hatchet, and male DNA was detected but not matched against any other DNA samples. Even if Ibrahim was on the scene, he never took the axe with him, and there are no allegations he ever possessed it or a similar weapon again, or that he had possessed a hatchet in the past.

The unreliable witnesses, the fact no officer saw him with a hatchet, or even saw him near these alleged victims on June 11, 2021, and the lack of physical evidence connecting him with the hatchet all show that there was no conduct evidencing an intent to carry out this threat.

### 2. Ibrahim's criminal history does not show conduct evidencing an intent to carry out such threat

Probation states this enhancement should apply not only because of the June 11, 2021 incident, but also "defendant's history of arrests and convictions (see Criminal History section below) also reflects incidents of physical abuse against Wilma." (PSR, ¶24). The Government argues the history of domestic abuse coupled with the June 11 incident shows that this enhancement should apply. Yet Ibrahim's criminal history does not reflect his intent to carry out the threat to which he pled. In 2018, Ibrahim was convicted in Kenai, Alaska for "Assault in 4th Degree." The PSR states the conduct leading to this charge was "Kenai Police officers responded to the local library about an assault in progress" and relies on this for the 6 point enhancement. This conviction is too remote in time to be used as "conduct which evidences an intent to carry out the threat."

The PSR notes only two other cases where Wilma is the alleged victim, and both are still pending in court in Arizona (PSR, ¶57;58). The charges in these two cases are pending and therefore should not be used against Ibrahim when determining either his sentence or if these points apply, as they are bare allegations that have not been proven by any standard of evidence. Additionally, in both of these pending incidents, and the incident for which Ibrahim was

14

convicted - there was no use of any knife or other weapon. Nor was there any significant injury or allegations of attempting to kill her. Further, he has never been charged or accused of attempt murder. The allegations contained in the pending cases and the case in Ibrahim's background do not mention or allege the use of any weapon. Ibrahim's criminal history does not show any intent to carry out the threat made, and therefore this six point enhancement cannot apply.

### B. Defendant objects to "double counting" of criminal history points

Examining Ibrahim's entire criminal history when determining if this enhancement will apply risks double counting. The Seventh Circuit has held "a district court risks double-counting when it enhances a defendant's sentence on the basis of crimes that are unconnected to the threatening communication since a "recidivism penalty" is "built into the guidelines." *United States v. Thomas*, 155 F.3d 833, 838 (7th Cir. 1998) (internal citations omitted). The probation department calculates that Ibrahim is assessed two criminal history points for the Kenai, Alaska assault in the 4th degree discussed above. (PSR, ¶51). This conviction is also being used by probation and the government to argue for this enhancement for conduct evidencing the ability to carry out the threat. This one incident, for which Ibrahim received 60 days custody and 3 years probation, is increasing his guidelines more than any previous conviction should. This conviction is being double counted as it is increasing Ibrahim's criminal history points and being used to increase the base offense level. The court should take into account this double counting when crafting a sentence for Ibrahim.

### C. Defendant objects to two criminal history points for being on probation at the time of the offense

In the presentence report, the probation department posits that Ibrahim was on probation in case number 3KN-19-00473CR out of the District Court for the State of Alaska when this offense occurred. (PSR, ¶53). The probation department comes to this conclusion because that

term of probation "was imposed on July 18, 2018." (PSR, ¶53). The probation department goes on to state, "the date of termination of probation is not specified in the court records submitted to this officer." (PSR, ¶53). The probation department then extrapolates that because there is no date specified, this means it was not terminated early. (PSR, ¶53). This conclusion cannot be drawn based on the fact there is no information about the termination date. If there is no information about when probation is or could be over, a determination cannot be made whether Ibrahim was on probation or not when this incident occurred. Therefore, these two additional points cannot be added based only on speculation when no information from the court has been received.

Even if the court finds that the guideline calculations, as calculated by probation and the government, are accurate, this court should still give Ibrahim a 13 month sentence. The government's request of a sentence at the high of the guideline range would result in a sentence greater than necessary to meet the purposes of punishment. The government states in its sentencing memorandum that the guidelines are "designed to lend consistency and fairness to sentencing and are "the product of careful study based upon extensive empirical evidence derived from the review of thousands of individual sentencing decisions." (Dkt. 48, citing *Gall v. United States*, 552 U.S. 38, 46-47 (2007)). However, as this court is aware, the court has to consider all the factors in 18 U.S.C. § 3553(a) not just the calculated guideline range. As the Supreme Court has observed, "[t]he fact that section 3553(a) explicitly directs sentencing court's to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50, n. 6. The guideline range is one of many factors for this court to consider and in this case there are factors discussed above which demonstrate why a guideline sentence is greater than

necessary.

### D. Defendant objects to Discretionary Condition 14

Ibrahim has no ties to the Northern District of Illinois. The charge he pled guilty to has no connection to the Northern District of Illinois. Ibrahim has never lived in this district, has no family here, no friends, no community, nor any support system. The government arrested him in Oregon, put him in custody there where he sat until he was transferred, in custody, to the Northern District of Illinois. The government brought him to the Northern District of Illinois when he has no connections here at all. In order to be successful on supervised release, Ibrahim needs community support. He cannot build community easily from being plucked from the place where he had previously lived. Individuals in the mosque he attended in Eugene were interviewed by the FBI and discussed Ibrahim's dedication to the community and to the mosque. Ibrahim, while living an unconventional lifestyle, had begun to establish a life in Eugene. He established ties there and knows how to navigate the systems in the city that are there to help him. There are multiple drug and alcohol treatment programs in Eugene, and many social service organizations that help those without housing access the resources they need. Ibrahim is requesting, when released on supervised release, to be monitored in the District of Oregon.

## VI. CONCLUSION

Wherefore, Ibrahim respectfully asks this Court to sentence him to 13 months. Any sentence higher than 13 months would be greater than necessary to meet the purposes of punishment.

Respectfully submitted,

s/ Dena M. Singer
Dena M. Singer
Bedi & Singer, LLP
53 West Jackson Blvd., Suite 1505

17

Chicago, IL 60604
(312) 525 2017
dsinger@bedisinger.com

18

**<u>Certificate of Service</u>**

I, Dena M. Singer, hereby certify, I caused a copy of the foregoing Memorandum to be served on upon the Assistant United States Attorney by causing it to be electronically filed with the Clerk of the Court using the CM/ECF system.

<u>/s/ Dena M. Singer</u>
Dena M. Singer